**BANCROFT CONVERTIBLE FUND, INC.**

v.

**ZICO INVESTMENT HOLDINGS INC., Michael B. Javett, First Fidelity Bank, N.A., Georgeson & Company Inc. and Luthie Intercontinentale, Inc.**

**Appeal of ZICO INVESTMENT HOLDINGS INC.**

**No. 87–5260.**

United States Court of Appeals, Third Circuit.

Argued June 23, 1987.

Decided July 29, 1987.

732

Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, Theodore Altman (argued), Lawrence J. Zweifach, Steven A. Coploff, Jody Craig Zucker, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J. (Gregory B. Reilly, of counsel), for defendant-appellant.

Matthew M. Strickler (argued), Darryl J. May, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa. (Robert A. Wayne, Jack M. Sabatino, Robinson, Wayne, Levin, Riccio & LaSala, Newark, N.J., of counsel), for plaintiff-appellee.

Before GIBBONS, Chief Judge, and WEIS and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

Zico Investment Holdings Inc. (Zico) appeals from orders of the district court which granted a preliminary injunction against its tender offer for shares of Bancroft Convertible Fund, Inc. (Bancroft) and which denied its motion to vacate that injunction. Bancroft is a closed-end investment company. The district court granted the preliminary injunction after concluding that Bancroft was likely to succeed in establishing that completion of the tender offer by Zico would result in a violation of section 12(d)(1)(A) of the Investment Company Act of 1940, 15 U.S.C. § 80a–12(d)(1)(A) (1982) (the Act). Section 12(d)(1)(A) prohibits an investment company from acquiring more than three (3) percent of the outstanding voting stock of another investment company. Zico contends that the preliminary injunction should be reversed because (1) there is no private cause of action for enforcement of the prohibition in section 12(d)(1)(A) of the Act; (2) the court erred in concluding Bancroft is likely to succeed in proving that Zico is an investment company; and (3) Bancroft made an inadequate showing of irreparable harm. We affirm.

## I.

### Implied Private Cause of Action

Relying on Judge Hastie's opinion in *Taussig v. Wellington Fund, Inc.*, 313 F.2d 472, 476 (3d Cir.), *cert. denied*, 374 U.S. 806, 83 S.Ct. 1695, 10 L.Ed.2d 1031 (1963), the district court concluded that Bancroft's complaint states a claim upon which a private party can seek enforcement of the prohibition in section 12(d)(1)(A) of the Act. In *Taussig*, this court held that a complaint seeking private enforcement of the prohibition against use of deceptive investment company names, section 35(d) of the Act, 15 U.S.C. § 80a–34(d), stated a claim arising under the laws of the United States, and was sufficient to support pendent jurisdiction over a common-law unfair competition claim. Zico maintains that the district court's reliance on *Taussig* was misplaced for several reasons.

Zico's first objection is that, unlike the case at bar which involves private enforcement of section 12(d)(1)(A), *Taussig* involved private enforcement of section 35(d). Admittedly, there is no reported case in this court or any other which deals specifically with private enforcement of the anti-pyramiding prohibition in section 12(d)(1)(A). Zico makes no persuasive argument, however, which suggests congressional intention to treat the prohibition against investment company pyramiding differently, for purposes of private enforcement, than are the various other prohibitions in the Act which are also intended to protect investors.

Next, Zico argues that, assuming a private cause of action for enforcement of the Investment Company Act may be implied, Bancroft's management should not have standing to assert it in a tender offer situation. Not only is there no supporting authority to sustain it, but this argument also ignores the realities of tender offer litigation which demonstrate that such a standing rule would be toothless. It is virtually certain that an objecting shareholder would intervene in tender offer litigation. More fundamentally, however, we note that section 10 of the Investment Company Act, 15 U.S.C. § 80a–10 (1982), which governs membership on boards of directors of investment companies, indicates that those directors are uniquely qualified to assert private causes of action in the interest of the security holders to whom they owe fiduciary obligations.

Finally, Zico urges that *Taussig*, and the many other cases in other courts,[1] which have recognized the availability of private enforcement of the Investment Company Act have been overruled by the line of Supreme Court cases that followed *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *See, e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979). Those cases suggest that, in determining whether a private cause of action may be implied from a federal regulatory statute, the starting point is congressional intention.

In *Fogel v. Chestnutt*, a characteristically thorough and analytical opinion, Judge Friendly considered and rejected the contention that the post-*Cort v. Ash* cases overruled the settled law on private causes of action under the Investment Company Act. *See Fogel v. Chestnutt*, 668 F.2d 100, 105–12 (2d Cir.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). Pointing to the numerous decisions in courts of appeals which, from 1961 forward, upheld private causes of action under the Investment Company Act, Judge Friendly concluded that the issue should be resolved in the same manner as was the question of private causes of action under Rule 10b–5. *See Fogel*, 668 F.2d at 111, (citing *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)).

We need not repeat Judge Friendly's *Fogel v. Chestnutt* analysis here. We do note, however, that it is consistent with the analysis made a short time later by the Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). In *Curran*, the Court considered whether there is an implied private right of action for enforcement of the Commodity Exchange Act (CEA). After many courts of appeals had so held, Congress amended the CEA in 1974 and 1978, but neither the original act nor the amendments addressed the subject of private judicial remedies. The *Curran* Court, stating that the crucial issue was whether Congress, in amending the CEA, intended to preserve pre-existing implied remedies, reasoned:

> In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the [amending] legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry is logically different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy.

*Id.* at 378–79, 102 S.Ct. at 1839 (footnote omitted). Noting that prior to the amendments, federal courts routinely and consistently recognized an implied private cause of action under the CEA, the *Curran* Court concluded that an implied cause of action under the CEA was, therefore, part of the "contemporary legal context" in which Congress acted in amending the Act. *See id.* at 381, 102 S.Ct. at 1841. The Supreme Court found that:

> In that context, the fact that a comprehensive reexamination and significant amendment of the CEA left intact the

1. *See Esplin v. Hirschi*, 402 F.2d 94, 103 (10th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Levitt v. Johnson*, 334 F.2d 815, 819 (1st Cir.1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965); *Brown v. Bullock*, 294 F.2d 415, 418 (2d Cir.1961). *But see Brouk v. Managed Funds*, *Inc.*, 286 F.2d 901, 912 (8th Cir.), *cert. denied*, 366 U.S. 958, 81 S.Ct. 1921, 6 L.Ed.2d 1252 (1961), *vacated as moot per curiam*, 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 (1962), later questioned by the Eighth Circuit in *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 793 (8th Cir. 1967).

statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy. *Id.* at 381–82, 102 S.Ct. at 1841 (footnote omitted). Therefore, the *Curran* Court held, the prior law on implied causes of action for enforcement of the statute survived.

■ We find *Fogel v. Chestnutt* persuasive authority and *Curran* controlling. Thus, we turn to the facts presented in the instant appeal and apply the *Curran* Court's reasoning. In 1970, Congress comprehensively reexamined and significantly amended the Investment Company Act. *See* Investment Company Amendments Act of 1970, Pub.L. No. 91–547, 84 Stat. 1413. By then, courts of appeals had routinely recognized private causes of action under the statute.[2] As was the case with the Commodity Exchange Act amendments, the legislative history of the 1970 amendments to the Investment Company Act is silent with respect to congressional intent to preserve or deny pre-existing remedies. *See* S.Rep. No. 184, 91st Cong., 2d Sess. (1970); H.R.Conf.Rep. No. 1631, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S. Code Cong. & Admin. News 4897–4948. Zico points out that section 20 of the 1970 amendments did add one specific private cause of action for damages which permits a shareholder of an investment company to sue the investment company's investment adviser on the company's behalf for recovery of excessive fees. *See* 15 U.S.C. § 80a–35(b) (1982). That substantive change in the law authorizing shareholders to sue to enforce a new standard[3] was necessary to overcome the substantive effect, in the derivative suit context, of the business judgment rule because the fees of fund managers are agreed to by fund directors. Inclusion of such an express private remedy has nothing to do with other sections of the Act, however, and in no way suggests a congressional intent to abolish established implied causes of action for their enforcement. *See Fogel v. Chestnutt*, 668 F.2d at 111; *Tannenbaum v. Zeller*, 552 F.2d 402, 417 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977).

■ Any possible doubt about the applicability of *Curran* as a controlling precedent is dispelled by the fact that Congress revisited the Investment Company Act in 1980, amending it in parts of the Small Business Investment Incentive Act of 1980. *See* Pub.L. No. 96–477, 94 Stat. 2275 (1980). That amendment also left intact those provisions from which courts had implied private causes of action. The amendment's legislative history, moreover, discloses congressional enthusiasm for private enforcement. The House Report on Pub.L. No. 96–477 states:

> The rationale for implying private rights of action under the securities laws beyond those actions expressly provided for had been well articulated by the Supreme Court when it observed that implied private rights of action allowing shareholders to sue to remedy their losses would significantly assist the congressional goal of promoting fair corporate suffrage.[5] But in recent years, the Supreme Court turned its focus toward a strict construction of statutory language and expressed intent.[6]
>
> The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law.[7] In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the Investment Company Act. With

2. *See* note 1, *supra.*

3. Congress added section 36(b) to "make it clear that, as a matter of Federal law, the investment adviser or mutual fund management company has a fiduciary duty with respect to mutual fund shareholders." S.Rep. No. 184, *reprinted in* 1970 U.S.Code Cong. & Admin.News at 4898.

respect to business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.[8]

5. *J.I. Case Co. v. Borak,* 377 U.S. 426, at 433, 84 S.Ct. 1555, at 1560, 12 L.Ed.2d 423 (1964).

6. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Investors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). In *Transamerica,* as in *Redington,* the Court did not go beyond a consideration of historical Congressional intent to a consideration of the need for the private remedy, or its role in effectuating Congress' purpose in enacting the provision. Although the Court agreed that the statute was designed for the express purpose of protecting adviser's clients, and those clients offered to show both that the law was violated and that they suffered monetary loss as a result, the Court would not imply a private cause of action for damages on their behalf.

7. These are essentially the tests enunciated by the Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

8. See *Tannenbaum v. Zeller,* 552 F.2d 402, 416–17 (2d Cir.1976), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *Moses v. Burgin,* 445 F.2d 369, 373 (1st Cir.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971); H.R.Rep. No. 1382, 91st Cong., 2d Sess. 38 (1970).

H.R.Rep. No. 1341, 96th Cong., 2d Sess. 28–29 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 4800, 4810–11 (footnotes within footnotes omitted). Clearly, the Committee Report expressly approves the position of those courts which, following the 1970 amendments, held that private causes of action should be implied from the Investment Company Act. *Curran,* therefore, compels the rejection of Zico's contrary position. We conclude that the district court correctly held that there is an implied private cause of action under section 12(d)(1)(A) of the Investment Company Act.

## II.

### Zico's Status As An Investment Company

█ As previously noted, section 12(d)(1)(A) prohibits an investment company from purchasing any security of another investment company if, after the purchase, the acquiring company owns more than 3 percent of the outstanding voting stock of the acquired company. Bancroft is an investment company and the tender offer contemplates that Zico will acquire a controlling interest in Bancroft. Thus, if Zico is an investment company, the acquisition would be illegal. Zico argues that it is not an investment company. The district court held, however, that Bancroft is likely to succeed in establishing that Zico is. In so ruling, the district court applied the definition of investment company in section 3 of the Act, 15 U.S.C. § 80a–3 (1982) and the attribution provisions within that section. Zico does not dispute that it falls within the basic definition in section 3(a) of the Act, since it is in the business of investing and reinvesting in investment securities. Zico contends, however, that it falls within the exemption in section 3(c), which provides:

(c) Notwithstanding subsection (a) of this section, none of the following persons is an investment company within the meaning of this subchapter:

(1) Any issuer whose outstanding securities (other than short-term paper) are beneficially owned by not more than one hundred persons and which is not making and does not presently propose to make a public offering of its securities. For purposes of this paragraph:

(A) Beneficial ownership by a company shall be deemed to be beneficial ownership by one person, except that, if the company owns 10 per centum or more of the outstanding voting securities of the issuer, the beneficial ownership shall be deemed to be that of the holders of such company's outstanding securities (other than short-term paper)....

15 U.S.C. § 80a–3(c). Zico's position is that the attribution rule of section 3(c)(1)(A) is inapplicable because Zico Investment Holdings Inc. has fewer than 100 stockholders and no stockholder owns 10 percent or more of its stock. The district court concluded, however, that Bancroft is likely to prove that the stock of Zico Investment Holdings Inc. is held by a well-organized

coordinated group which, for purposes of the exemption, should be treated as a single company. "Company" is defined in section 2(a)(8) of the Act as

a corporation, a partnership, an association, a joint-stock company, a trust, a fund, or any organized group of persons whether incorporated or not....

15 U.S.C. § 80a–2(a)(8). "Person" is defined as "a natural person or a company." 15 U.S.C. § 80a–2(a)(28) (1982). Thus, an organized group of natural and artificial persons can be a "company" for purposes of the Act.

Relying on *Prudential Ins. Co. of America v. SEC*, 326 F.2d 383, 387 (3d Cir.), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1629, 12 L.Ed.2d 497 (1964), Zico maintains that the "organized group of persons" to which section 2(a)(8) refers is confined to unincorporated organizations like the so-called "Alexander Fund," in which a group of individual investors pool their funds and entrust them for investment to a manager who acts as their agent. *Prudential,* however, is not dispositive of the issue presented here. In *Prudential,* we affirmed an SEC ruling that an account in which Prudential Insurance Company proposed to invest premiums of variable annuity contracts was an investment company because the purchasers of those contracts were an "organized group of persons." We rejected the argument that the definition refers only to recognizable business entities. *See id.* at 387. Although Zico contends otherwise, *Prudential* does not stand for the proposition that, absent a common pool or fund, such an organized group is not a company. Thus, we reject Zico's contention that the district court misconstrued section 2(a)(8) and 2(a)(28) of the Act.

Zico further argues that, assuming a group which does not maintain a common fund can be a company, the court's "well-organized coordinated group" finding is clearly erroneous. We review under the deferential standard of Fed.R.Civ.P. 52.

The evidence discloses that Zico Investment Holdings Inc. was incorporated on July 15, 1986 in the British Virgin Islands. At that time, Luthie Intercontinentale, Inc.

(Luthie), a Panamanian corporation controlled by Michael B. Javett, had acquired 108,167 shares, or slightly less than 5%, of Bancroft's voting shares. Zico Investment Holdings Inc. has an authorized capital stock of $14 million, divided into 100 voting "A" shares having a par value of $20,000 each, and 600 non-voting "B" shares having the same par value. Except for voting rights to appoint or to remove directors or officers, the two classes of stock are equal. Javett originally purchased six shares of Zico's Class A stock for $145,000. Thereafter, various subscription agreements resulted in ownership of Zico Investment Holdings Inc. as follows:

Javett, 8 percent of all shares and 55 percent of Class "A" shares.

Tolux, a Luxembourg corporation, 23 percent of all shares and 4 percent of Class "A" shares.

Zatto Group S.A., a Luxembourg corporation, 20 percent of all shares and 8 percent of Class "A" shares.

Consolidated Talcorp., Ltd., a Canadian corporation, 15 percent of all shares and 7 percent of Class "A" shares.

Luthie Intercontinentale, Inc., a Panamanian corporation, 23 percent of all shares and 9 percent of Class "A" shares.

Solitaire Investment, Ltd., a Swiss company, 7 percent of all shares and 9 percent of Class "A" shares.

Varley Finance, Inc., a Panamanian corporation, 3 percent of all shares and 8 percent of Class "A" shares.

Thus, except for Javett, no shareholder in Zico Investment Holdings Inc. owned more than 10 percent of its voting stock. That pattern, Zico contends, qualified Zico Investment Holdings Inc. for the exemption in section 3(c)(1)(A).

Nonetheless, the district court found:

Here, under Javett's aegis, we have a cluster of interrelated investment companies (some, at least, publicly traded) allocating among themselves ZICO's voting stock so that no one of them owns 10%, but which in the aggregate own well in excess of that percentage. The precise interrelationship of the companies is

shown in the chart which accompanied my March 16 opinion.

The fact that this aggregation of companies constitutes an organized group and thus a "company" is shown by matters in evidence at the March 16 hearing and by new material which defendants submitted in support of their motion. For example: (i) Between them, Tolux, Zatto Group, S.A., Consolidated Talcorp, Ltd., and Luthie Intercontinentale own 81% of ZICO and 28% of its Class A stock. (ii) ZICO's initial board of directors consisted of Javett (a director of Tolux, Zatto and Talcorp.), Kerr (a director of Luthie and an attorney for Zatto), Smith and Dr. Koch. Quite obviously to reduce the appearance of interrelatedness, two of these ZICO directors resigned (Smith, who is a director of Talcorp. and Tolux, and Dr. Koch, who is a director of Tolux and of another corporation, Solitaire, whose relationship to the others has not yet been fully explored). (iii) Javett's statement that when Tolux acquired its interest in Zatto in February 1986 the two companies "formed an understanding" that Tolux would not vote its shares to influence the composition of, or policies adopted by, Zatto's board illustrates both the degree to which the interrelated companies have worked together to create an impression of independence and also the potential for joint action whenever the group chooses to take such action. (iv) Javett and Buckland, who are both directors of Tolux, joined the Zatto board in February 1986, the same month that Tolux acquired its interest in Zatto.

To contend, as defendants do, that each of the corporate entities which has invested in ZICO is independently investing its money so as to take advantage of Javett's investment acumen taxes one's credulity. It seems rather clear to me that they constitute a very well organized and coordinated group which, as a group, owns such a large quantity of ZICO's voting stock that their stockholders must be considered stockholders of ZICO. In that circumstance, consumma-tion of the tender offer would violate the Act.

*Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.*, Civ. Action No. 87–870, slip op. at 4–6 (D.N.J. Apr. 16, 1987).

■ Zico insists that there is no evidence of record supporting the district court's inference that Tolux, Zatto, Consolidated, Luthie, Solitaire, and Varley were anything but independent actors. Clearly, however, the district court drew permissible inferences from the facts presented. While no corporate shareholder owns more than 10 percent of the voting stock in Zico Investment Holdings Inc., there is ample evidence of interlocking ownership, interlocking directorships, and coordinated activity. Thus, we cannot hold that the district court's "well coordinated group" finding is clearly erroneous. The district court properly concluded that Bancroft is likely to succeed at final hearing in establishing a violation of the anti-pyramiding provisions of the Investment Company Act.

### III.

### Irreparable Harm

■ Zico's final contention is that the preliminary injunction against the tender offer should be reversed because there is no support for the trial court's conclusion that irreparable harm could occur to the Bancroft shareholders if the tender offer were not enjoined. There is evidence that Bancroft has pursued a conservative investment policy and has paid out to its shareholders 100% of income and gains from the sale of securities. There is also evidence that, if Zico obtains control, Javett intends to pursue both a different investment philosophy and a different distribution policy. The district court, discussing irreparable harm pendente lite, reasoned:

Weighing the equities, Bancroft and its shareholders rely on certain investment policies. Control of the corporation alone is of no moment to a court. However, if control brings with it irreversible adverse consequences, that does become a concern of the Court. Here it has been established that Bancroft has maintained

an investment policy which presumably its shareholders wish to pursue or else they wouldn't have purchased or retained their shares. Some of those who wish to continue to pursue such investment goals no doubt tendered their stock to ZICO, fearful that ZICO might change those policies. They can take their money and seek investments similar to their investments in Bancroft elsewhere. Other Bancroft shareholders probably hope present management and policies will continue and were persuaded by management's arguments to stay on and not let ZICO acquire control through the purchase of their shares. They would be injured if ZICO takes over and pursues its likely plan to change investment policies.

Once ZICO acquires the stock it seeks it will be difficult or impossible to return to the status quo ante.

ZICO, on the other hand, entered a risky business knowingly. If it is delayed or prevented from pursuing the tender offer it still has its money and can look for other opportunities elsewhere. The interests of the Bancroft stockholders far outweigh the interest of ZICO and its various associated companies and individuals.

*Bancroft Convertible Fund, Inc. v. ZICO Investment Holdings Inc.,* Civ. Action No. 87–870, Transcript of Proceedings on March 16, 1987 at 72–73 (D.N.J.1987).

Zico argues that, instead of requiring proof that Bancroft or its shareholders would be irreparably harmed, the district court merely "balanced the equities." That contention is without merit. The reference to "weighing the equities" plainly refers to the district court's obligation to take into account not only the possibility of harm to the plaintiff if a preliminary injunction is not granted, but also the possible harm to other interested parties if it is granted. *See, e.g., Delaware River Port Auth. v. Transamerican Trailer Transp. Inc.,* 501 F.2d 917, 919–20 (3d Cir.1974).

Zico also urges that the irreparable harm finding is speculative and unsupported by the evidence. The district court, however, credited the opinions of two Bancroft directors, Dinsmore and Halsted, that, if as a result of the tender offer, Zico obtained control, the resultant change in Bancroft's investment policies would irreparably harm its minority shareholders. There is ample evidence, given the pendency of an annual meeting, that changes in control, and thus in investment and distribution policies, could take place before final hearing. Therefore, Zico's speculative argument is without merit.

Zico's final objection to the irreparable harm finding is that Bancroft delayed in applying for a preliminary injunction, thereby permitting Zico to go forward with an earlier tender offer in which it acquired more than 3% of the shares. Zico insists that Bancroft should have moved for a preliminary injunction after 3% of the shares were tendered. We are unpersuaded. Zico attempts to confuse pendente lite and final relief. It may be that, at final hearing, Zico will be forced to divest itself of all Bancroft shares in excess of 3%. *See* 15 U.S.C. § 80a–12(d)(1)(A). But it is only the spectre of change in control, pendente lite, which justifies pendente lite relief. Certainly, Bancroft applied for such relief when a change in control became a realistic possibility. Thus, Zico's contention is without merit.

## IV.

### Conclusion

There is an implied private cause of action for enforcement of the Investment Company Act. The district court did not err in concluding that Bancroft is likely to succeed in establishing that the Zico tender offer, if successful, would violate section 12(d)(1)(A) of the Investment Company Act because the Zico shareholders are a well-organized and coordinated group, and thus a company. The court properly found the likelihood of irreparable harm. Thus, the orders appealed from will be affirmed.